May it please the court. The district court erred in this matter because it relied on how Watson made its tablets rather than the actual structure of those tablets. There are no process limitations in these claims and in fact, the district court was specifically asked by Watson to insert a process limitation and the district court denied that request. In particular, Watson asked the district court to construe the term form to mean formulation or blend and the district court said that the proper definition of form is configuration and that to adopt Watson's claim proposed meaning would quote because the proper term was configuration because quote, it does not add a process limitation into the claims. I'm having difficulty following this. I mean, what we're talking about here is a claim which requires two portions and as I understand it, the Watson product is a matrix tablet. It's homogenous. There's no difference either in terms of beads or bilayer tablets or anything like that. So why wasn't the district court correct that there's no infringement? The term homogenous is a vague term that's not used in the patent itself. What the patent does is describe the term form in terms of the structure of the active ingredient, in this case, glyphenicin and it was undisputed that there is glyphenicin on the outside layer of Watson's tablet. There's also an active ingredient on the inside, right? Absolutely, but that glyphenicin on the inside layer is inhibited by the polymer in that tablet as well. Once it gets wet, right? The way it works, your honor, you're correct, is that as the tablet is wetted by gastric fluid, the outside granules of glyphenicin, which are separately formulated by a third party, get wet, they rapidly release and behind those granules is polymer and that polymer  sounds to me as though you're saying once it's in the stomach it has two portions, but maybe it didn't have two portions when it was in pill form. Your honor, it had two portions when it was in pill form. All I'm describing is what occurs, what happens once it's in the stomach because what the district court said is that the term immediate release form refers to a configuration in which the glyphenicin rapidly releases. So what we're saying is that yes, there's glyphenicin granule on the outside of the stomach, but the court decided whether that glyphenicin was, what it was, what portion it was, was to define it in terms of what happens when it's in the stomach. Well, any tablet is going to start to dissolve in its outer portions, I mean that's the portion that's exposed to digestive fluids. That doesn't mean it has two portions. Well your honor, I think the thing is not every tablet would dissolve the way Watson's tablet dissolves. I mean, Dr. Banker said, well, I asked him, well, what would happen if you put a coating on the outside? And he says that would be the last thing you would do because you wouldn't get the unique release profile of Bucinex. That in fact, if you had a tablet, you could configure it such that there was a way to avoid the rapid release that's required by the claims. And that's what our position is. Where are the two portions of the accused tablet? The first portion are the glyphenicin granules on the outside of the tablet, where there's no polymer between it and the glyphenicin. And those rapidly release. That's shown by the PK data. We see the release profile on page five of our brief. And everything below those glyphenicin granules where there's polymer that would inhibit the release. There's polymer on the outside too, right? There's some polymer, but not very much polymer on the outside. But the tablet is made from a uniform mix. There's no attempt in manufacturing the tablet is there to provide the surface with a different composition than the interior of the tablet. Well, I would suggest that in fact there was an intent to do that. And the way that there was an intent to do that is Watson knew that these matrix tablets would have active ingredient on the outside layer. They adjusted the other ingredients, the amount of polymer. There's very little polymer in this formulation. There's about 5.8%... But there's the same amount of polymers on the outside and on the inside, because it's a uniform tablet, right? We didn't quantify the amount of polymer, but there will be polymer on the outside of the tablet. But there's no proof that there's a different amount of polymer on the outside and on the inside, right? That's correct, Your Honor. That's a problem. Well, I think the thing is to look at is what happened with the outside of these tablets. One skill in the art would understand that they have glyphosate granules that would rapidly release. Watson used that in developing their product. They specifically said, well, we know that these so-called non-layer tablets will release in this way. And what the district court didn't say, well, didn't construe the terms to mean or portion to mean, well, it depends on how you make the tablet. All the district court said is that the meaning of an immediate release form is how is the active ingredient configured? And what they said, if it's configured to rapidly release without any other process limitations, then that's sufficient for the immediate release form. That's the simple language in the claims. And in terms of whether there was a discreet, whether the portion needs to be discreet or not, the district court relied on one sentence in the specification to insert the word discreet. And in fact, that one sentence makes clear that the term discreet was used in the context of a bi-layer tablet. It said, the specification specifically says that this invention also relates to a modified release glyphenosine tablet, which comprises two discreet portions, a bi-layer tablet. Nowhere else in the specification or in the file history did the applicants ever use the word discreet. And nowhere in the specification or the file history did the applicants ever say that our invention is different from the prior art based on whether we have layers or non-layers. The applicant in the prosecution, in fact, there was a reference, the Paradisus reference. And in that reference, the examiner said, well, Paradisus has these IR and SR particles that are blended, that go into a uniform blend and form a non-layer tablet. The applicant didn't distinguish their invention based on whether it had layers or not. What the applicant said is that we have a different PK profile than Paradisus. We have a unique PK profile that gives this immediate large rise, large burst followed by discreet. That's the result, the structure is two portions. The structure says two portions, but the applicant in distinguishing Paradisus didn't say that our invention is different from Paradisus based on the structure. They said it was different based on the PK profile. So the examiner understood that there would be immediate release particles on the outside of Paradisus as well. Yet the distinguishing factor was the actual PK profile. It's how much of those particles are on the outside. And it's- Where is the process limitation that you were talking about? Right. So the district court repeatedly said- Where is the process limitation in the claim? There are no process limitations in the claim. That's the point. The district court said Watson doesn't infringe because of the way they make their product. They make it- No, that's not what he said. He said they don't infringe because it's a uniform tablet. Well, I think he said something along that line, but Your Honor, we have in our brief at page 36 and 37, paragraph after paragraph after paragraph where he says Watson doesn't infringe based on the way he bakes the product. Watson doesn't infringe because they have a single formulation, a formulation inferring that the way they formulate the product makes a difference. Watson doesn't- But it's hard to read what the district court did and not come away thinking that the conclusion was that it was a distinction in having a bilayer structure, a two-component structure. Not a question of manufacturing. It's a question of whether the structure provides for two discrete portions. Well, what I think the district court went wrong is that he effectively limited the claims to bilayer tablets. And Watson never argued during the claim construction period that the claims were, in fact, limited to bilayer tablets. They, in fact, said we never argued that the claims are limited to bilayer tablets. And I think what happened, and in fact, Watson never made the disclaimer argument that they make now during the claim construction proceeding. I think what the district court may have done is ultimately decided that they don't infringe because they're not a bilayer tablet. But that's not what the claims say. The claims simply say that you have to show that there's a portion of the tablet, a discrete or identifiable or distinct portion of the tablet, in which the glyphenosine granules rapidly release. Well, there are only two embodiments, right? One is a bilayer tablet, and the other one is BEATS. Well, no. Actually, the non-layer tablet, formulation MR1, is a non-layer tablet. Dr. Banker confirmed that it has glyphenosine granules on the outside that rapidly release. It's shown in figure 7. Figure 7 has a large burst of immediate release glyphenosine granules on the outside with MR1, a non-layered modified release tablet. And Dr. Banker confirmed that that would mean that the glyphenosine on the outside of that tablet rapidly releases. And on appeal, Watson admits that the release of the granules from MR1 actually is faster than an immediate release dosage form. Because if you look at figure 7, it has four things in it. Where does the specification disclose an embodiment that's a uniform tablet? The specification discloses an embodiment, MR1, that's called a non-layer tablet, that is a matrix tablet similar to what Watson made. But that's not my question. Where does it disclose a tablet that's a uniform composition tablet? Well, I may not understand your question, so let me try to answer it the best I can. The specification has three examples that are called non-layer, or two are called sustained release, and one is called a modified release. And they didn't work, right? Well, the first two were short on the CMAX and the PK limitation. It looks like the drafter of this patent threw in everything that the scientists did, that which worked and that which didn't work, and they claimed ultimately that which worked, the bi-layer. Well, they actually claimed the other embodiments that had no PK limitations. That was what claims 1 through 11 are. But what they put in several... But that's not what we're dealing with now. No, we're dealing with the claims as they exist, right? Yeah, 1 through 11 were canceled. So the focus then shifted to the claims directed to these two portions. Well, actually, the claims that existed at the time, that 1 and 11 were canceled, were to a modified release product. They didn't all recite two portions, but they all were related to a modified release product. And a modified release product was defined by the district court as having IR and SR properties. And Dr. Banker said, he said, if the tablet has IR and SR properties, it has an IR and SR portion. And he said, Dr. Banker said, that MR1 has glyphenicin on the surface that rapidly released. That is by definition... Embodiments disclosed in the specification and not the bilayer. There was two sustained release, and then there was one called a modified release tablet, Your Honor. He was talking about the modified release tablet that was not a bilayer tablet. And what he said about that tablet is that he said it has glyphenicin on the surface, that glyphenicin rapidly releases. He also said that if you have immediate release properties and sustained release portions, which by definition MR1 does, then you have two portions. His own testimony supports that. That's his view. But in terms of the specification, in looking at the specification where we're talking about a two-portion embodiment, right, where does it say that the two-portion embodiment can have a uniform structure? Well, Your Honor, just to be clear, Dr. Banker was speaking from one of ordinary skill in the art. That was a specific question. And there's no specific language that says that, but one of ordinary skill looking at the art and looking at the data, not just the description, but looking at the data, looking at the release properties, and the actual profiles, Dr. Banker was asked at trial, would understand that MR1 has two portions, that it has an IR portion and an SR portion. You're down to about a minute and a half of rebuttal time, which I'll save for you, Mr. Conde. Mr. Boggs. Thank you, Your Honors, may it please the Court. I just wanted to address a couple points there. First of all, MR1 is a non-layered tablet that didn't work. We need to be clear on that. And it's described in the specification as something that doesn't have an immediate release blend, which, according to the patent, would be the extra portion. And that's the reason it didn't work. On the question of how the tablets were made, that is all relevant evidence. It's relevant evidence that tends to show, one way or another, whether you can prove the fact. And what that evidence showed was that it was more likely than not that Watson's tablet was a one-portion tablet. That's what that evidence is good for. What about the dissolving at the edges? Well, the dissolving at the edges is just what polymer matrix tablets do.  You're saying that's not a separate portion? I'm sorry, Your Honor? You're saying that's not a separate portion? It is not a separate portion. Why not? It does dissolve, so therefore it's in a form that becomes fully bioavailable. That's what the claim calls for. Well, what the dissolving glyphenicin is, is part of the sustained release polymer matrix. Are you saying if that's a portion, then there's an infinite number of portions as you go through each amount of the material? Well, I suppose that at some level of microscopy, you could count as many portions as you wanted to. But not two? But certainly not two, and in the context of this patent, I don't believe that's what was intended by the term portion. If you actually read the patent and understand what they're talking about when they talk about portions, they're talking about formulations. Immediate release portions are formulations that somebody like a doctor banker can look at and say, this is a sustained release formulation, a sustained release portion. And that's the context in which all of this is talked about in the specification. They're not talking about location of glyphenicin granules. They're not talking about speed of release. They're not talking about sequence of release. They're talking about formulations. Immediate release formulations are something people understand. The FDA has a whole category of immediate release products. They are different from modified release products. Modified release products, this nomenclature that we're tossing about here, that doesn't tell us anything other than the fact that it's something different than an immediate release. But all these terms are strewn throughout the specification, immediate and modified and sustained. Your view is that bilayer in the claims is what controls? Well, the words bilayer is not in the claim, in claim 24. Oh, what's that claim? Two portions. Two portions. Yes. Yes, I think that the requirement that the product have two portions and the requirement that the two portions be discrete, I think that did their job in excluding a non-layered single formulation polymer matrix tablet. It doesn't have to be bilayered. It could have beads. There's a bead embodiment. Yes. Yes. Exactly. The claim 24, according, if you read that in light of the specification, it's generic to capsules with beads and a bilayer tablet. Never, not once, do they talk about a non-layered single formulation polymer matrix tablet being a two portion tablet. Never once, not once, do they talk about surface touching glyphenicin as being its own separate portion. The surface touching glyphenicin that we see in these polymer matrix tablets, that's common to all of them. And they never call it a separate portion. It's just not. It's not. It is part of the sustained release portion. If you take it off, you haven't created a new portion. It's still the one sustained release portion. So, you know, Reckitt plainly claimed around single formulation non-layered tablets. That's their story of patentability. That's their basis for patentability. The entire patent is structured that way. You see the big part of the specification that talks about sustained release formulations and then you have the part about bilayer tablets. You need the extra portion, the extra portion, not the surface touching glyphenicin from the sustained release portion. You need the extra portion of an immediate release formulation to get the C-max that we find in claim 24. So, when you read the specification in the proper context, you see that non-layered tablets, single formulation tablets, didn't work and they weren't intended to be part of this invention. Or at least not ultimately. Yeah. Well, you know, it's... They were claimed earlier. The sustained release formulation was. Claims 1 through 11. And it matches up with that first part of the specification. And it's, you know, it's always interesting to hear what the inventors had to say before the lawsuits began. In their official research records. If there's any question about this, in their official research records, their reports that they give to their bosses, 10 months after, 10 months after the patent application was filed, this is what the inventor said. And you can find this in the appendix of 42.409. For non-layered tablets, non-layered single formulation tablets, the sustained release things that we see in the specification, they said the C-max was too low. Something needed to be done to give the tablet pop in the first hour. The only way, according to the inventors, and that was their word, the only way to accomplish that task was with a bi-layered tablet. So, that's exactly what the patent says too. No, it does not say that. Well, it says, right, it says capsules with beads. Yes. Correct. I stand corrected, your honor. I'm sorry. So, these inventors certainly didn't conceive, they didn't conceive of a non-layered tablet that would give the necessary C-max. You know, conception requires a definite and permanent idea of a complete and operative invention. They didn't have that with a non-layered tablet. But now, they seek the right to exclude others from one. And that's not the way it's supposed to work. Thank you. So, anything further, Mr. Boggs? I think that's enough, your honor. Thank you. Mr. Conde has some rebuttal time. I'll be very short. It sounds like Mr. Boggs is now saying that portions means formulations. The word formulation is not in the claim. That's exactly what the district court said it was, when the district court said it wasn't limiting the claim, the word form to formulations, because it would insert a process limitation. Mr. Boggs spent a considerable amount of time saying that portions equals formulations. Mr. Conde, are you contending that the accused structure, the first portion is the surface of the tablet? Where there's glyphenosine granules, yes, your honor. Well, if you took that surface and you ground it off in the accused structure, would it still infringe? It probably would not infringe, because it wouldn't have enough of the glyphenosine on the outside to give the appropriate PK profile. If you took those granules off the outside of the surface of the tablet, it wouldn't have enough… Well, if you just ground off the outside layer. Right. If the tablet is made of a uniform mixture, what difference would it make? The surface, it would be a different surface, but the surface would be composed of the same mixed materials. Well, that issue never really was raised during the trial, but I will answer it like this, which is that it does seem like the surface has an unusual amount of glyphenosine on the outside layer compared to below it. Well, there's no evidence of that. Well, I told you it wasn't an issue that was raised. It wasn't an issue. I mean, Dr. Banker never said, well, if we took off the outside layer, it would be the same thing we'd have to have. But isn't this of some significance, because the claim calls for two portions. Right. So the question is, well, where are the two portions? And if it's made of a material that's homogeneous, then it's difficult to identify two separate portions. Well, it isn't difficult to identify, because it doesn't just limit it to two portions. The whole claim says where the immediate release portion is configured to rapidly release. So the question to be asked is, is there glyphenosine granules configured to rapidly release? And it's clear that the outside layer provides that configuration. That's all that the claims require. They don't require us to show that it had a layer. There's nothing in the formulation that provides the argued configuration, correct? The formulation is consistent throughout. Well, the formulation is the list of ingredients that they put into the blender, and you end up with the tablet. It's all blended together and just formed into a tablet. Right. I don't recall... So there's no distinct configuration on the surface. Watson did not intentionally create a layer, but they knew all along that a layer would be created. They knew all along, by making the tablet, they only put in 5% polymer. They absolutely knew, and the art confirms this, that there would be a burst effect from that. All they did is they tweaked the amount of ingredients. They took our tablet, they ran a dissolution profile, and they took another tablet that was made using a matrix tablet. And they tweaked the ingredients in their matrix tablet to match exactly the dissolution profile of our product. And so what they did is they knew all along they're going to have glyphenosine on the surface. All they merely did is tweak the amount... It's called design-around, isn't it? Well, I don't think... not if you end up with the glyphenosine on the surface of the tablet that rapidly releases. I mean, maybe there's some other way of designing around the tablet, but that's not... They chose to use this... they chose to make a tablet this way, where they knew they would have glyphenosine on the surface, which in effect is the same thing as having another layer of glyphenosine. Similar to the bead example. Thank you, Mr. Kondi. I think we have your argument. We'll take the case on submission.